## AFFIDAVIT OF SPECIAL AGENT BRIAN HENDRICKS

I, Brian Hendricks, state:

### *AGENT BACKGROUND*

1.      I have been a Special Agent with the United States Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI") since February 2009. Before joining FDA-OCI, I served for approximately eight years as an Inspector for the U.S. Postal Inspection Service ("USPIS") and as a Special Agent with the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"). During that time, I was responsible for investigating Title 18 and Title 26 violations impacting the interests of those agencies. I have completed several federal agency-sponsored training courses, including FDA-OCI Special Agent Basic Training, the FDA-OCI Federal Food, Drug, and Cosmetic Act Law Class, FDA-OCI Cybercrime Investigations Basic Training and Advanced Training, the USPIS Basic Inspector Training, IRS Special Agent Basic Training, and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center.

2.      As a Special Agent with FDA-OCI, I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and other federal statutes enforced by the United States Food and Drug Administration ("FDA"). During my employment in federal law enforcement, I have learned various means and methods by which illegal prescription drug and device traffickers obtain, possess, transport, divert, and distribute counterfeit prescription drugs and devices, misbranded prescription drugs and devices, unapproved new drugs, controlled substances, and the equipment used to manufacture them.

### *PURPOSE OF AFFIDAVIT*

3.      I am investigating Rebecca FADANELLI ("FADANELLI") (also known as Rebecca Daley and Rebecca Hawthorne) for violations of 18 U.S.C. § 545 (smuggling goods into the United States), 21 U.S.C. § 331(i)(3) (sale/dispensing of counterfeit drugs), and 21 U.S.C. § 331(fff)(3) (sale/dispensing of counterfeit devices) (together, the "TARGET OFFENSES"), among other offenses.

4.      As set forth below, there is probable cause to believe that FADANELLI has been importing counterfeit prescription drugs and devices, including but not limited to Botox, Sculptra, and Juvederm,[1] and illegally selling, dispensing, and/or administering them to clients of her business, Skin Beaute Med Spa. I make this affidavit in support of an application for a criminal complaint charging FADANELLI with the TARGET OFFENSES, and for a warrant for her arrest.

5.      I also submit this affidavit in support of applications for warrants under Federal Rule of Criminal Procedure 41 to search FADANELLI's home, at 155 York Street, Stoughton, Massachusetts (the "TARGET PREMISES"), and FADANELLI's vehicle, a white 2022 Range Rover Sport with vehicle identification number (VIN) SALWS2RU4NA232794 and Massachusetts license plate number 1KGN87 (the "2022 Range Rover" or the "TARGET VEHICLE"), as described in Attachment A-1 and Attachment A-2, respectively, because there is probable cause to believe that the TARGET PREMISES and the TARGET VEHICLE contain evidence and instrumentalities of the TARGET OFFENSES, including counterfeit prescription drugs and devices, as described in Attachment B to the proposed warrants.

---

[1] Botox, Sculptra, and Juvederm are prescription drugs and devices intended to be administered via injection for cosmetic purposes. Botox is FDA-approved to treat, among other things, facial wrinkles. Sculptra and Juvederm are FDA-approved injectable dermal fillers.

6.      This affidavit is based on my personal knowledge and observations, my training and experience, information provided by other FDA employees, evidence obtained from undercover operations, open-source data, business records, and information provided by witnesses and other law enforcement officers. This affidavit is not intended to set forth all of the information I have learned during this investigation but includes only the information necessary to establish probable cause for the requested complaint and warrants.

## *RELEVANT LAW*

### *The Federal Food, Drug, and Cosmetic Act*

7.      The FDA is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the FDCA. Among the purposes of the FDCA is to ensure that drugs and medical devices sold for human use are safe and effective for their intended uses and bear true and accurate labeling.

8.      Under the FDCA, a "drug" is, among other things, any article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans and any article (other than food) intended to affect the structure or any function of the human body. 21 U.S.C. § 321(g)(1).

9.      A "device" is defined in relevant part as an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article intended to affect the structure or any function of the human body, and which does not achieve its primary intended purposes through chemical action within or on the human body and which is not dependent upon being metabolized for the achievement of its primary intended purposes. 21 U.S.C. § 321(h).

10.     Under the FDCA, a prescription drug or prescription device is one that, because of its toxicity, other potential harmful effects, the methods of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by

law to administer the prescription drug or prescription device. 21 U.S.C. § 353(b)(1)(A); 21 C.F.R. § 801.109.

11.     The FDA regulates Botox as a prescription drug and Sculptra and Juvederm as prescription medical devices.

12.     The term "counterfeit drug" means, in part, a drug which, or the container or labeling of which, without authorization, bears the trademark, trade name, or other identifying mark, or any likeness thereof, of a drug manufacturer, and which thereby falsely purports or is represented to be the product of that drug manufacturer. 21 U.S.C. § 321(g)(2).

13.     The term "counterfeit device" means, in part, a device which, or the container, packaging, or labeling of which, without authorization, bears a trademark, trade name, or other identifying mark, or any likeness thereof, of a device manufacturer, and which thereby falsely purports or is represented to be the product of that device manufacturer. 21 U.S.C. § 321(h)(2).

14.     The FDCA prohibits, among other things, the sale or dispensing, or the holding for sale or dispensing, of a counterfeit drug or counterfeit device. 21 U.S.C. §§ 331(i)(3), 331(fff)(3).

15.     Any person who violates 21 U.S.C. § 331(i)(3) or § 331(fff)(3) by knowingly selling or dispensing a counterfeit drug or counterfeit device is subject to imprisonment for up to ten years and/or applicable fines. 21 U.S.C. § 333(b)(8), 18 U.S.C. § 3571.

### 18 U.S.C. § 545 (Smuggling Goods into the United States)

16.     It is a violation of 18 U.S.C. § 545 to fraudulently or knowingly import into the United States any merchandise contrary to law, or to knowingly receive, buy, or sell such merchandise after importation.

17.     As stated above, under the FDCA, it is unlawful to sell or dispense, or to hold for sale or dispensing, a counterfeit drug or counterfeit device. Accordingly, the importation of

counterfeit drugs or counterfeit devices into the United States for sale or dispensing is contrary to law.

### PROBABLE CAUSE TO BELIEVE A FEDERAL CRIME WAS COMMITTED

#### Investigation Background

18.     On June 25, 2024, United States Magistrate Judge David H. Hennessy authorized warrants to search and seize certain prescription drugs, prescription devices, and business records maintained by FADANELLI at her business, known as Skin Beaute Med Spa, with locations in Randolph, Massachusetts and South Easton, Massachusetts.[2] *See* 24-mj-4303-DHH, 24-mj-4305-DHH (both under seal). My affidavit in support of the government's applications for these search warrants is incorporated by reference and attached as Sealed Exhibit 1 to this affidavit. As set forth therein, FDA-OCI initiated this investigation in response to a complaint filed with the FDA concerning FADANELLI and her business.

19.     Specifically, an individual, referred to in Sealed Exhibit 1 and herein as "Client 1," filed a complaint with the FDA after undergoing a "lip filler" procedure[3] performed by FADANELLI at the Skin Beaute Med Spa office in Randolph in September 2022.[4]

20.     When I contacted Client 1 in response to her complaint, she provided the following additional information. Before beginning the lip filler procedure, FADANELLI told Client 1 that

---

[2] Per records maintained by the Secretary of the Commonwealth of Massachusetts, FADANELLI is the President of Skin Beaute Inc. and is also the Vice President and Director of Linda Concept Inc. (a clothing store in Weymouth, Massachusetts).

[3] Based on my training and experience, I am aware that "filler" refers to a prescription device that is administered via injection to eliminate skin wrinkles or to enlarge certain areas of the face, for example, the lips.

[4] Based on her review of a picture of FADANELLI from the Skin Beaute Med Spa website, Client 1 confirmed that it was FADANELLI who performed the procedure.

she was a nurse. FADANELLI injected Client 1's lips using a syringe containing an unknown substance. When Client 1 asked FADANELLI what the injected substance was, FADANELLI did not respond directly, stating only that she purchases her products from Brazil and China. After injecting Client 1's lips, FADANELLI also injected Client 1 between her eyebrows using the same syringe, reportedly without Client 1's permission.[5]

21.     At some point after the procedure, Client 1 experienced "bumps" in her lips and tingling in her forehead where FADANELLI had injected her. Client 1 called FADANELLI and requested a copy of the prescription for the substance FADANELLI had administered via injection, but FADANELLI never provided one. Client 1 conducted online research and found information indicating that FADANELLI was not a registered nurse and may not have been certified to conduct the procedure performed on Client 1.

22.     After speaking with Client 1, I contacted United States Customs and Border Protection ("CBP") regarding FADANELLI. An officer assigned to Homeland Security Investigations ("HSI") as a task force officer ("TFO") informed me that CBP and HSI had opened an investigation into FADANELLI and that CBP had detained or seized international parcels shipped to FADANELLI based on suspicion that the parcels contained misbranded and/or unapproved prescription drugs or devices.[6]  Based on this information, FDA-OCI, in coordination with CBP, continued to investigate FADANELLI.

---

[5] Client 1 paid $275 for the procedure (via credit card).

[6] Under the FDCA, a drug or device is misbranded if "its labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1). Therefore, counterfeit drugs and devices – as defined above – are also misbranded.

*Seizures by U.S. Customs and Border Protection*

22.    Between approximately November 2023 and March 2024, CBP seized at least six parcels that were addressed to FADANELLI or to individuals who have been identified as employees of Skin Beaute Med Spa. The destination addresses listed on the seized parcels include FADANELLI's home in Stoughton, Massachusetts (the TARGET PREMISES) and both Skin Beaute Med Spa offices. The parcels all originated from China and were sent via UPS, DHL, or FedEx.

23.    Per CBP records, the seized parcels contained various products appearing to be prescription drugs or devices intended to be administered via injection, including products labeled as Botox, Sculptra, and Juvederm.

24.    For example, as set forth in detail in Sealed Exhibit 1, one of the seized parcels – addressed to Rebecca Dailey at the Skin Beaute Med Spa office in Randolph – was declared as containing "plastic bottles and plastic container." In fact, the parcel contained 20 boxes of a product labeled as Botox. CBP notified FADANELLI of the seizure, advising her that the parcel had been seized because the products contained therein were suspected of being misbranded and unapproved. FADANELLI acknowledged to CBP that she was responsible for the parcel and requested return of the seized products. CBP informed FADANELLI that because the seized products were in violation of FDA regulations, they could not be released to her without FDA approval.[7]

25.    In addition to the seized parcels, CBP seized products from FADANELLI in connection with an in-person inspection conducted at Logan Airport upon FADANELLI's return

---

[7] All of the other parcels addressed to FADANELLI or Skin Beaute Med Spa employees that were seized by CBP have been or will be forfeited based on the FDA's advice that they should not be released.

from Brazil in October 2023. CBP found that FADANELLI was in possession of a variety of prescription drugs and devices, including several vials of liquid labeled as Sculptra and vials of bacteriostatic water (sterile water used to inject diluted or dissolved medication into a patient's body), in addition to several other vials of liquid with labels in foreign languages. The FDA Compliance Branch determined that all of these products were misbranded or unapproved.

### *Information Provided by Manufacturers*

26.     As set forth in detail in Sealed Exhibit 1, FDA-OCI sent photographs of certain products contained in the seized parcels to investigators employed by the manufacturers of the authentic products. Representatives of AbbVie Inc., the parent company of Allergan, which is the manufacturer of both Botox and Juvederm, and Galderma S.A., the manufacturer of Sculptra, concluded that the photographed products labeled as Botox, Juvederm, and Sculptra are counterfeit.

27.     In addition, there is no customer account for FADANELLI (or Rebecca Daley or Rebecca Hawthorne) or Skin Beaute Med Spa in AbbVie's customer shipment records[8] or in customer records maintained by Galderma's exclusive distributor. There is thus no indication that FADANELLI has ever purchased authentic prescription drugs or devices from AbbVie or Galderma.

### *FADANELLI's Massachusetts Occupational Certifications*

28.     The Bureau of Health Professions Licensure, a component of the Massachusetts Department of Public Health that is responsible for the licensing of health care professionals

---

[8] These records do include a customer by a different name, "Doctor 1," using the address of the Skin Beaute Med Spa office in Randolph. The purchase history for Doctor 1's account shows only one purchase, on May 14, 2021, for various non-prescription skin creams manufactured by AbbVie but no purchases of Botox or Juvederm.

(including nurses) in Massachusetts, has no record of any licensure or certification for FADANELLI (or Rebecca Hawthorne or Rebecca Daley).

29.     Per records maintained by the Division of Occupational Licensure for the Commonwealth of Massachusetts, FADANELLI is a registered aesthetician.

30.     Aestheticians are not permitted to administer injections of prescription drugs or devices in Massachusetts.[9]

31.     Accordingly, I do not believe that FADANELLI is authorized to prescribe, dispense, or administer prescription drugs or devices, including through injections.[10]

### Skin Beaute Med Spa Website and Social Media Accounts

32.     As of in or around December 2023, the website for Skin Beaute Med Spa – skinbeautemedspa.com – included a picture of FADANELLI and a narrative stating that FADANELLI is an aesthetician and has a degree in anatomy from "Havard" [sic]. The narrative claimed that FADANELLI specializes in "advanced cosmetic procedures" and is licensed by the Massachusetts "Estate Board." The narrative went on to state that "Rebeca [sic] brought to her

---

[9] The Massachusetts Board of Registration of Cosmetology and Barbering has issued a policy (2017-01), most recently amended on March 12, 2019, which states, in part, "Individuals licensed by the Board as cosmetologists, aestheticians, manicurists, barbers or electrologists shall not perform any medical or invasive procedures, as they are beyond the authorized scope of licenses issued by the Board and represent a risk of infection and consumer injury . . . Prohibited medical and invasive procedures include, but are not limited to, A) Any injection of substances, including but not limited to Botox, dermal fillers such as collagen, hyaluronic acid (restylane), and any other injectable substances[.]"

[10] In or around June 2023, an inspector with the Division of Occupational Licensure conducted an inspection of the Skin Beaute Med Spa office in South Easton and found syringes present in the aesthetics room, resulting in the issuance of a $100 fine. The inspection report notes that a Skin Beaute Med Spa employee told the inspector that the syringes were related to the administration of Botox in the aesthetics room.

business . . . spa services provided by a team of estheticians[11] and hardworking nurses," that "Skin Beaute is dedicated to all aspects of beauty enhancement, including all skincare treatments, laser treatments, Botox and Dermal Fillers," and that "[t]hroughout her career, Rebeca also qualified as a Licensed Instructor by the Massachusetts State Council[.]"[12]

33.    There are separate Instagram accounts for Skin Beaute Med Spa's two office locations. The business description for both accounts is: "RN/Skin Specialist/Body Art/Aesthetics" and "Botox/fillers." The feed for the South Easton Instagram account promotes Botox and lip fillers. The feed for the Randolph Instagram account promotes Botox, lip fillers, Sculptra, dermal fillers, and nose fillers.

### *Vagaro, Inc. Records*

34.    Skin Beaute Med Spa uses a business management platform called Vagaro. Vagaro allows its customers (usually small businesses such as spas and salons) to schedule appointments, issue invoices, and accept payments.

35.    Vagaro's webpage for Skin Beaute Med Spa indicates that the business offers Botox, dermal fillers, eyebrow microblading, and permanent makeup by "skilled aestheticians and nurse practitioners." Vagaro's scheduling function for Skin Beaute Med Spa allows clients to select, among other products/services, Botox, Sculptra, and/or "fillers,"[13] and to specifically select FADANELLI as the provider.

---

[11] Aestheticians generally provide medical-based facial and beauty treatments, while estheticians offer cosmetic beauty services such as facials, peels, and waxing.

[12] As of October 2024, the majority of this narrative was in Portuguese rather than English (as it had been previously).

[13] As noted above, Sculptra is a dermal filler. It is unclear why Sculptra and "fillers" are listed/categorized separately.

36.    Records obtained from Vagaro include a client list for Skin Beaute Med Spa, along with a list of client appointments. The list of client appointments includes details for each appointment, including the service provided and who provided the service. The services included in the list include (among many others): "Botox," "fillers," and "Sculptra."

37.    As discussed in Sealed Exhibit 1, the Vagaro records show that during the time periods referenced below, FADANELLI completed the following appointments:

| Time Period | Type of Appointment | Number of Appointments | Total Payments |
|---|---|---|---|
| March 2021-March 2024 | Botox | 1,631 | $522,869 |
| March 2021-March 2024 | "Filler" | 990 | $378,954 |
| September 2021-March 2024 | Sculptra | 95 | $31,591 |

*Undercover Operation*

38.    As described in Sealed Exhibit 1, a confidential source of information ("SOI") made consensually recorded phone calls with employees of Skin Beaute Med Spa and also recorded an in-person appointment with FADANELLI.[14] These communications were primarily in Portuguese and have since been translated by a translation services company retained by FDA-OCI.

39.    During the consensually recorded calls, which took place in March and April of 2024, the SOI spoke to two different Skin Beaute Med Spa employees about scheduling a Botox appointment with "Rebecca." One of the employees told the SOI that Skin Beaute Med Spa was offering a "deal" for Botox and also mentioned that Rebecca could provide a Sculptra treatment.

---

[14] FDA-OCI has utilized this SOI in other, similar investigations, and I believe the SOI to be reliable. FDA-OCI provided financial compensation to the SOI for the SOI's assistance with this investigation.

During the second call, another employee scheduled the SOI for a Botox consultation with Rebecca on April 9, 2024 at the Randolph office.

40.     The SOI consensually recorded the above-referenced Botox consultation using both a covert camera and audio recording equipment. A Skin Beaute Med Spa employee escorted the SOI to an examination room, where a woman met the SOI and introduced herself as "Rebecca." Based on my review of the recording and known photographs of FADANELLI, I believe that the woman who met with the SOI was FADANELLI.

41.     During the consultation, FADANELLI instructed the SOI to lie down on an examination table in the room and proceeded to examine the SOI's face. FADANELLI told the SOI that Botox would help with the appearance of wrinkles. FADANELLI also recommended "filling" certain areas on the SOI's face and advised that she could provide "sculpt" (which I believe to be a reference to Sculptra). FADANELLI gave the SOI a quote of $450 for the Botox treatment. When the SOI asked FADANELLI about the authenticity of the Botox she uses on her clients, FADANELLI advised that she uses actual Botox and that its results last for up to four months.

### *Skin Beaute Med Spa Search Warrants*

42.     On June 28, 2024, law enforcement agents executed the above-referenced search warrants at Skin Beaute Med Spa's offices in Randolph and South Easton.

43.     Prior to searching the Randolph office, agents observed FADANELLI exit the 2022 Range Rover (the TARGET VEHICLE) in the parking lot and enter the office building carrying several bags. During the search, agents found that these bags contained various injectable prescription drugs and devices, including what appeared to be counterfeit Sculptra.[15] Elsewhere in

---

[15] Galderma later determined the products labeled as Sculptra to be counterfeit.

the office, agents found what appeared to be counterfeit Juvederm and counterfeit Restylane,[16] empty vials of what appeared to be counterfeit Botox, and various unlabeled vials and foreign-labeled drugs.[17]

44.    In addition to the counterfeit prescription drugs and devices, agents seized digital evidence from computers and mobile phones and documents related to the administration of injectable prescription drugs and devices (*e.g.*, patient files) from the Randolph office.

45.    During the search of Skin Beaute Med Spa's South Easton office, agents found and seized what appeared to be counterfeit Juvederm, empty vials of what appeared to be counterfeit Botox, and unlabeled drug vials, in addition to digital evidence from an office computer and documents related to the administration of injectable prescription drugs and devices.[18]

### Witness Interviews

46.    During execution of the search warrants at the Randolph and South Easton offices, agents interviewed FADANELLI and various Skin Beaute Med Spa employees and business associates.

47.    During her interview, FADANELLI told agents that Skin Beaute Med Spa offers Botox and dermal filler services, but claimed that these services are provided only by a certified nurse (not FADANELLI) employed by Skin Beaute Med Spa. According to FADANELLI, the nurse most recently employed had left several months prior, and Skin Beaute Med Spa had not yet hired a new nurse.

---

[16] Restylane is another injectable dermal filler manufactured by Galderma, regulated by the FDA as a prescription device.

[17] AbbVie later determined the products labeled as Juvederm and Botox to be counterfeit, and Galderma later determined the products labeled as Restylane to be counterfeit.

[18] An AbbVie representative confirmed that the products labeled as Botox and Juvederm found in the South Easton office are counterfeit as well.

48.     FADANELLI further stated that she is not a nurse and claimed that she does not administer injectable drugs or devices to Skin Beaute Med Spa's clients. When agents asked FADANELLI if she would like to retract or modify that claim if she knew there was evidence showing that she was in fact administering such products, she reiterated that she does not administer injections.

49.     FADANELLI confirmed that she purchases Botox and other injectable drugs and devices from a Chinese supplier through Alibaba[19] and also said that she sometimes sells these products to other individuals.[20] FADANELLI claimed not to know whether these products are FDA approved. She also told agents that she stopped ordering injectable drug and device products from China when CBP seized some of these products and notified her that they were "not allowed."

50.     FADANELLI also confirmed that Skin Beaute Med Spa uses Vagaro to manage its client appointments,[21] and stated that she uses her cell phone to review and schedule client appointments through Vagaro.

51.     Agents also interviewed a Skin Beaute Med Spa employee (referred to herein as "Employee 1"), who was responsible for preparing clients for Botox and dermal filler treatments. Employee 1 told agents that FADANELLI administers injections of Botox and filler to Skin Beaute Med Spa's clients, noting that a client present at the Randolph office at the time of the search was scheduled to receive filler injections from FADANELLI. Employee 1 further stated that FADANELLI brings the injectable products with her when she commutes to and from Skin Beaute

---

[19] Alibaba is a Chinese-owned online marketplace that connects businesses with suppliers, manufacturers, and wholesalers.

[20] FADANELLI told agents that the nurses previously employed by Skin Beaute Med Spa provided their own supply of injectable drugs and devices.

[21] FADANELLI noted that Skin Beaute Med Spa sometimes uses another platform called "Booker."

Med Spa. Employee 1 said she did not know how FADANELLI obtained the products. Employee 1 also told agents that FADANELLI told Employee 1 that she (FADANELLI) is a nurse.

52.    Agents interviewed another Skin Beaute Med Spa employee (referred to herein as "Employee 2"), who was responsible for managing client appointments through Vagaro. Employee 2 corroborated each of the above-described statements made by Employee 1.

53.    After executing the warrants, agents interviewed a former Skin Beaute Med Spa employee (referred to herein as the "Former Employee") who had worked for FADANELLI for several years and whose job responsibilities included covering the reception desk, scheduling client appointments, and ordering supplies. The Former Employee told agents that during his time at Skin Beaute Med Spa, FADANELLI administered the injectable prescription drugs and devices offered by the spa unless FADANELLI was traveling, in which case a registered nurse provided these services. The Former Employee estimated that the registered nurse administered prescription drugs or devices to a total of approximately six Skin Beaute Med Spa clients, and said that in these instances, FADANELLI still supplied the products.

54.    The Former Employee stated FADANELLI told the Former Employee – and the above-referenced nurse – that FADANELLI was a nurse.

55.    The Former Employee further stated that, at FADANELLI's direction, the Former Employee purchased injectable drugs and devices from Alibaba because, according to the Former Employee, they were cheaper. For example, the Former Employee explained that a vial of Botox costs approximately $50 when purchased from Alibaba.[22]

56.    The Former Employee explained that eventually, CBP started to seize the products purchased from Alibaba, so the Former Employee provided Alibaba with different delivery

---

[22] A vial of authentic Botox costs approximately $650.

addresses to use for the shipments. Specifically, the Former Employee stated that originally, Alibaba shipped the products to the Skin Beaute Med Spa office in Randolph, but when CBP began seizing parcels, the Former Employee had Alibaba send the shipments to FADANELLI's home in Stoughton (the TARGET PREMISES) instead. Then, after CBP began seizing the parcels addressed to FADANELLI's home, the Former Employee had Alibaba send the shipments to FADANELLI's clothing store in Weymouth (see footnote 2 above). Finally, after CBP seized parcels addressed to the clothing store in Weymouth, FADANELLI directed the Former Employee to have Alibaba send the shipments to an acquaintance of FADANELLI's who lives in Dorchester, Massachusetts.

57.     The Former Employee further stated that FADANELLI stored the products purchased from Alibaba at her home in Stoughton (the TARGET PREMISES) and transported them – in a silver briefcase and a lunchbox[23] – to Skin Beaute Med Spa's offices in Randolph and South Easton.

### Digital Evidence

58.     As noted above, during the searches of Skin Beaute Med Spa's Randolph and South Easton offices, agents seized certain digital devices, including two iPhones belonging to FADANELLI, an office iPhone used by Skin Beaute Med Spa employees, two office computers (one from each office), and a thumb drive.

59.     Agents recovered evidence of the TARGET OFFENSES from these devices, including but not limited to videos and images of FADANELLI performing injections, electronic communications between FADANELLI and a Chinese supplier of counterfeit prescription drugs

---

[23] During the search of the Randolph office, agents found a silver briefcase and lunchbox.

and devices,[24] and communications between FADANELLI and several Skin Beaute Med Spa clients who complained about the procedures she performed on them, as described further below.

60.    The above-referenced electronic communications between FADANELLI and the Chinese supplier include messages discussing purchase prices and attempts to avoid CBP seizures. For example, in December 2023, the supplier quoted its prices for purported Botox. FADANELLI responded, "But u shipping 20 Botox right? And 2 50 ml? I need shipping FedEx."[25]

61.    In February 2024, the supplier messaged FADANELLI, "your address custom have know [sic]," and FADANELLI responded, "ok…but now I lost to [sic] much money…you need to change your name to [sic]" The supplier replied, "I have change [sic]."[26]

62.    Later in February 2024, the supplier warned FADANELLI about the potency of the purported Botox the supplier was shipping to FADANELLI, stating, "this batch botox strong…add 3ml saline for try…please do not add too less saline it will be injection too much."[27]

63.    With respect to the communications between FADANELLI and Skin Beaute Med Spa clients, one client complained about "droopy eyes," while another complained about "little balls" developing in her lips. Another client (referred to herein as "Client 2") had a Botox/filler appointment with FADANELLI scheduled for March 9, 2024. On March 13, 2024, Client 2 sent FADANELLI a message complaining that she had a hard "lump" under her eye and that her eyes appeared to be "sunken in" as a result of the procedure. Client 2 also complained that she did not

---

[24] Parcels originating from this supplier were seized by CBP and found to contain counterfeit products.

[25] Based on my review of these communications, it appears that FADANELLI believed CBP was less likely to seize FedEx shipments than shipments through other common carriers.

[26] I believe that here FADANELLI and the supplier were discussing the use of new origination/destination shipping addresses on future parcels to avoid scrutiny/seizure by CBP.

[27] The potency of authentic Botox does not vary by "batch."

see any results in her cheeks. Later communications between FADANELLI and Client 2 reflect that FADANELLI had represented to Client 2 that she was a nurse.

### *Evidence of Ongoing Unlawful Activity*

64.     On or about October 17, 2024, I reviewed the Instagram page for Skin Beaute Med Spa's Randolph office (@skinbeautemedspa) and noticed approximately ten posts advertising or otherwise referencing Botox and dermal filler services that post-date the June 28, 2024 searches of Skin Beaute Med Spa's Randolph and South Easton offices. For example, a July 1, 2024 post depicted before and after photos from "[t]oday's Botox treatment," and an October 9, 2024 post depicted before and after photos from "[o]ur [filler] result today." The latter post stated, "[w]ith our Filler treatment we achieve a satisfactory result," and invited potential clients to "[a]ccess our website and schedule your appointment."

65.     On October 24, 2024, the above-referenced SOI made a consensually recorded phone call to Skin Beaute Med Spa's Randolph office and asked whether the SOI could schedule an appointment for Botox and dermal filler procedures with FADANELLI. The individual who answered the phone scheduled the requested appointment and later sent the SOI a text message confirming that the appointment would be with FADANELLI.

66.     Also on October 24, 2024, an AbbVie representative confirmed that neither FADANELLI nor Skin Beaute Med Spa had recently purchased any authentic Botox or Juvederm. The next day, a representative of Galderma likewise confirmed that neither FADANELLI nor Skin Beaute Med Spa had recently purchased any authentic Sculptra.

67.     Based on this information, I believe that FADANELLI is continuing to illegally administer counterfeit prescription drugs and devices to clients of Skin Beaute Med Spa.

*PROBABLE CAUSE TO BELIEVE THE TARGET PREMISES AND TARGET VEHICLE CONTAIN EVIDENCE AND INSTRUMENTALITIES OF THE TARGET OFFENSES*

68.     There is also probable cause to believe that the TARGET PREMISES and the TARGET VEHICLE, as described in Attachments A-1 and A-2, contain evidence and instrumentalities of the TARGET OFFENSES, as described in Attachment B.

69.     Specifically, based on the information set forth above and summarized below, I believe that both the TARGET PREMISES and the TARGET VEHICLE are likely to contain counterfeit prescription drugs and devices, including but not limited to products labeled as Botox, Juvederm, and Sculptra, and packaging, labeling, and/or containers for those products.

70.     As described above, in connection with the search of Skin Beaute Med Spa's Randolph office, agents observed FADANELLI exit the 2022 Range Rover (the TARGET VEHICLE) and enter the office carrying bags that were later found to contain counterfeit Sculptra.

71.     In addition, current Skin Beaute Med Spa employees told agents that FADANELLI brings injectable products with her when she commutes to and from the office, and the Former Employee stated that FADANELLI stored products purchased from Alibaba at her home in Stoughton (the TARGET PREMISES) and transported them – in a silver briefcase and a lunchbox (which agents found during the search of the Randolph office) – to Skin Beaute Med Spa's offices.

72.     Further, the Former Employee said that when CBP began seizing international parcels destined for the Skin Beaute Med Spa office in Randolph, he had Alibaba send the shipments to FADANELLI's home (the TARGET PREMISES) instead, and later changed the delivery address to FADANELLI's clothing store in Weymouth.

73.     Finally, on October 28, 2024, I observed FADANELLI leave the TARGET PREMISES carrying multiple bags and boxes, put the bags and boxes in the TARGET VEHICLE, and proceed to drive to Skin Beaute Med Spa's office in South Easton. While I could not see what

was in the bags and boxes, based on the evidence set forth above indicating that FADANELLI is continuing to provide Botox and dermal filler services using counterfeit products, there is probable cause to believe that she was carrying counterfeit prescription drugs and devices.

### *Seizure of Computer Equipment and Data*

74.     Based on my training and experience, and information provided by other law enforcement agents, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Apple iPhones, such as FADANELLI's phones, are such a type of phone. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence that reveals or suggests who possessed or used the device.

75.     Based on my training and experience, and information provided by other law enforcement agents, I am aware that businesses and individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

76.     In addition, based on Skin Beaute Med Spa's online presence, including its website and social media accounts, its use of Vagaro as a business management platform, and FADANELLI's statements to agents, I believe that FADANELLI uses one or more computers and/or smartphones to commit, communicate about, and/or store records relating to the TARGET OFFENSES.

77.     Based on my training and experience, and information provided by other law enforcement agents, I know that computer files or remnants of such files can be recovered months

or years after they have been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed internet pages or if a user takes steps to delete them.

21

e.  Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files created and the sequence in which they were created, although this information can later be falsified.

f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling law enforcement to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime(s) under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect(s). For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense(s) under investigation. For example, information within the computer may indicate the owner's motive

and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the requested warrant.

i.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.  In addition, based on my knowledge, training, and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past

customers/clients and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business related purposes.

78.    Based on my training and experience, and information provided by other law enforcement agents, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media (computer equipment) be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.    The volume of evidence – storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

    b.    Technical requirements – analyzing computer hardware, computer software, or storage media for evidence of criminal activity is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before

the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

79.    The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of the requested warrant. If the items described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

80.    Law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence described in Attachment B. If, however, law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

81.    In this case, I recognize that FADANELLI owns Skin Beaute Med Spa, which is a functioning business that performs some legitimate functions, and that seizing computer equipment may have the unintended and undesired effect of limiting the business's ability to function.

a.   As stated above, there are a variety of reasons why law enforcement agents might need to seize computer equipment for subsequent processing elsewhere. If FADANELLI, doing business as Skin Beaute Med Spa, requires access to data that is not evidence of a crime, law enforcement will work with her after the search to copy this data onto storage media provided by her for the business's use.

b.   If the search team determines that there is no reason to seize certain computer equipment possessed by FADANELLI during the execution of the requested warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical. Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files. Imaging permits agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be impractical, because imaging is resource-intensive: it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and specialized equipment, both of which might be unavailable. If law enforcement personnel do create an image

at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off site.

82.    This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FDA may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### *Unlocking a Device Using Biometric Features*

83.    I know from my training and experience, my own personal and professional use of cell phones, and information found in publicly available materials, that some models of cell phones made by Apple and other manufacturers offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

84.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to five fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked or (2) when the device has not been unlocked via Touch ID in

eight hours and the passcode or password has not been entered in the last six days. Thus, in the event law enforcement agents encounter a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

85.     The passcode that would unlock any device(s) found during the search of the TARGET PREMISES and TARGET VEHICLE is not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the device(s) found during the search of the TARGET PREMISES and TARGET VEHICLE to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

86.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the TARGET PREMISES and TARGET VEHICLE to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

87.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the TARGET PREMISES and TARGET VEHICLE to the sensor of the device(s) or place the device(s) in front of their faces for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

### CONCLUSION

88.    Based on the information described above, I have probable cause to believe that FADANELLI has violated 18 U.S.C. § 545 (smuggling goods into the United States), 21 U.S.C. § 331(i)(3) (sale/dispensing of counterfeit drugs), and 21 U.S.C. § 331(fff)(3) (sale/dispensing of counterfeit devices).

89.    Based on the information described above, I also have probable cause to believe that evidence and instrumentalities of these crimes, as described in Attachment B, are contained within the premises and vehicle described in Attachments A-1 and A-2.

Subscribed and sworn to,

Brian Hendricks
Special Agent
U.S. Food and Drug Administration

Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 on October 31, 2024

3:59 p.m.

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS