UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>REBECCA FADANELLI,<br><br>Defendant | No. 1:24-cr-10352-JEK |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO SUPPRESS (Dkt. No. 121)**

The government respectfully submits this opposition to defendant Rebecca Fadanelli's motion to suppress all evidence obtained from three cell phones seized in connection with law enforcement's searches of her business and her home pursuant to warrants issued by Magistrate Judge Hennessy (Dkt. No. 121). The affidavits submitted in support of the applications for these warrants established probable cause to believe that evidence of the crimes under investigation would be found on the seized phones, and the warrants appropriately limited agents' searches of the phones as required by the Fourth Amendment. For these reasons, and those set forth below, the Court should reject the defendant's request for blanket suppression.

## I. BACKGROUND

The defendant has been charged in an eight-count indictment with importing merchandise contrary to law and selling/dispensing counterfeit drugs and devices, in violation of 18 U.S.C. § 545 and 21 U.S.C. §§ 331(i)(3), 331(fff)(3), 333(b)(8), respectively. Dkt. No. 19. The indictment alleges that between approximately March 2021 and November 2024, the defendant: (1) imported counterfeit prescription drugs and devices, including counterfeit Botox and dermal fillers, from China and Brazil; and (2) injected the counterfeit prescription drugs and devices into clients of her

business, Skin Beaute Med Spa, despite having no license to perform injections. *Id.* Trial is set to begin on March 23, 2026. Dkt. No. 97.

Prior to the defendant's indictment, law enforcement agents executed several searches pursuant to the above-referenced warrants. Specifically, as discussed in detail below, on June 28, 2024, agents searched Skin Beaute Med Spa's two locations in Randolph and South Easton, Massachusetts, and on November 1, 2024, in connection with her arrest on a criminal complaint, agents searched the defendant's home in Stoughton, Massachusetts and her vehicle. Each of the four warrants provided for the seizure and off-site searching of computer hardware, including cell phones, for the items set forth in Attachment B to the warrants. The warrants also authorized law enforcement, in executing the searches of the target locations, to use biometric data, including finger/thumb prints and/or facial recognition data, to access such computer equipment.

### A. June 28, 2024 Searches of Skin Beaute Med Spa's Offices

On June 25, 2024, Brian Hendricks, then a Special Agent with the U.S. Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI"),[1] applied for, and Judge Hennessy issued, warrants to search Skin Beaute Med Spa's offices in Randolph and South Easton. *See* Dkt. Nos. 121-1, 121-2. Special Agent Hendricks submitted a single affidavit in support of the applications for both warrants, which describes the background of FDA-OCI's investigation into the defendant's illegal importation and sale/dispensing of counterfeit and/or misbranded drugs and devices, and the evidence obtained in connection with the investigation up to that point. *See* Dkt. No. 121-3. As relevant for purposes of the present motion, the affidavit contains the following statements:

[1] Special Agent Hendricks has since retired from the FDA and is now serving as an Investigator for the Medicaid Fraud Division of the Massachusetts Attorney General's Office.

1. At some point after the [lip filler procedure the defendant performed on Client 1], Client 1 experienced "bumps" in her lips and tingling in her forehead where FADANELLI had injected her. This caused Client 1 concern that FADANELLI may not have been qualified to conduct the procedure. Client 1 called FADANELLI and requested a copy of the prescription (for the medical device product FADANELLI administered via injection), but FADANELLI never provided her with one. Online research conducted by Client 1 indicated that FADANELLI is not a registered nurse and may not have been certified to conduct the procedure performed on Client 1. *Id.* ¶ 22.

2. The website for Skin Beaute Med Spa – skinbeautemedspa.com – lists both the Randolph Office and the Easton Office as its business locations. The "about" section of the website includes a picture of FADANELLI and a narrative stating that FADANELLI is an aesthetician and has a degree in anatomy from "Havard" [sic]. The narrative claims that FADANELLI specializes in "advanced cosmetic procedures" and is licensed by the Massachusetts "Estate Board." The narrative goes on to state that "Rebeca [sic] brought to her business . . . spa services provided by a team of estheticians and hardworking nurses," that "Skin Beaute is dedicated to all aspects of beauty enhancement, including all skincare treatments, laser treatments, Botox and Dermal Fillers," and that "[t]hroughout her career, Rebeca also qualified as a Licensed Instructor by the Massachusetts State Council[.]" *Id.* ¶ 44.

3. The Randolph Office and Easton Office maintain separate Instagram accounts. The business description for both accounts is: "RN/Skin Specialist/Body Art/Aesthetics" and "Botox/fillers." The feed for the Easton Office Instagram account promotes Botox and lip fillers. The feed for the Randolph Office Instagram account promotes Botox, lip fillers, Sculptra, dermal fillers, and nose fillers. *Id.* ¶ 45.

4. Skin Beaute Med Spa also maintains an online presence through Vagaro, Inc., a business management platform. Vagaro allows its customers (usually small businesses such as spas and salons) to schedule appointments, issue invoices, and accept payments. Vagaro's webpage for Skin Beaute Med Spa indicates that the business offers Botox, dermal fillers, eyebrow microblading, and permanent makeup by "skilled aestheticians and nurse practitioners." Vagaro's scheduling function for Skin Beaute Med Spa allows clients to select, among other products/services, Botox, Sculptra, fillers, and/or Ozempic, and to specifically select FADANELLI as the provider. *Id.* ¶ 46.

5. Business records obtained from Vagaro indicate that the Skin Beaute Med Spa account was created by FADANELLI on or about March 3, 2021, and remained active at the time the records were produced (in or around March 2024). The account lists FADANELLI's cell phone number ending in 7839 as a contact number. It also lists the addresses of both the Randolph Office and the Easton Office of Skin Beaute Med Spa. *Id.* ¶ 47.

6. As part of this investigation, and as set forth further below, a confidential source of information ("SOI") made consensually recorded phone calls with employees of Skin Beaute Med Spa and also recorded an in-person appointment with FADANELLI. These communications were primarily in Portuguese and have since been translated by a translation services company retained by FDA-OCI. *Id.* ¶ 54.

7. On or about March 5, 2024, the SOI made a consensually recorded phone call to the Randolph Office of Skin Beaute Med Spa and spoke to an employee, referred to herein as "Employee 1." During the call, the SOI told Employee 1 that the SOI was interested in a Botox treatment with "Rebecca." Employee 1 told the SOI that Rebecca works at both Skin Beaute Med Spa locations and at the time was offering a "deal" for Botox. The SOI asked whether Rebecca could also provide treatment for skin around the neck, and Employee 1 responded that Rebecca could provide a Sculptra treatment. *Id.* ¶ 55

8. On or about April 3, 2024, the SOI made another consensually recorded phone call to the Randolph Office and spoke with a different employee, referred to herein as "Employee 2." The SOI told Employee 2 that the SOI wanted to make an appointment with "Rebecca" for a Botox consultation. Employee 2 scheduled the SOI for a Botox consultation on April 9, 2024 at the Randolph Office. *Id.* ¶ 56.

9. In addition, based on my training and experience and the evidence described above, including the Vagaro records, I believe that the TARGET LOCATIONS are likely to contain correspondence, financial, transactional, and other records and/or tangible objects relating to Skin Beaute Med Spa's business. Such records and/or objects may include but are not limited to, general corporate records, occupational certifications and/or licenses for FADANELLI and/or Skin Beaute Med Spa employees (whether legitimate or fabricated), records of client appointments and treatments/services provided, financial records reflecting, for example, client payments and product purchases, and records pertaining to the source and importation of products purchased by the business, including the products contained in the parcels seized by CBP. *Id.* ¶ 62.

10. Based on my training and experience, and information provided by other law enforcement agents, I am aware that businesses frequently use computers to carry out, communicate about, and store records pertaining to their business operations. These tasks are frequently accomplished through sending and receiving business-related emails and instant messages; drafting other business documents such as spreadsheets and presentations; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money online. *Id.* ¶ 63.

11. Based on my training and experience, and information provided by other law enforcement agents, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Apple iPhones, such as FADANELLI's phone, are such a type of phone. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence that reveals or suggests who possessed or used the device. *Id.* ¶ 64.

12. Based on my training and experience, and information provided by other law enforcement agents, I am aware that businesses and individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media. *Id.* ¶ 65.

13. In addition, based on Skin Beaute Med Spa's online presence, including its website and social media accounts, and its use of Vagaro as a business management platform, I believe that FADANELLI used one or more computers and/or smartphones to commit, communicate about, and/or store records relating to the TARGET OFFENSES. *Id.* ¶ 66.

The warrants authorized law enforcement to search the Randolph and Easton offices of Skin Beaute Med Spa for "[a]ll records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of: 21 U.S.C. § 331(i)(3) (sale or dispensing, or holding for sale or dispensing, of a counterfeit drug); 21 U.S.C. § 331(c) (receipt in interstate commerce of a misbranded drug or misbranded device and delivery or proffered delivery of the drug or device for pay or otherwise); 18 U.S.C. § 545 (importing or receiving merchandise knowing that it has been imported into the United States contrary to law); and/or 18 U.S.C. § 2320 (trafficking in counterfeit goods), all from January 1, 2021, through present[.]" Dkt. Nos. 121-1 at 6, 121-2 at 6. Attachment B to each of the warrants contains an illustrative list of the types of items to be seized, which, as relevant here, includes records or tangible objects pertaining to: customers who received treatments or services involving products intended to be administered through injection for cosmetic or other purposes; payments for services involving such products; the

purchase, importation, and source of such products; and/or adverse health events related to such products, including but not limited to customer complaints. *See id.*

With respect to any computer hardware—defined, in part, as "any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device)"—called for by the warrants or that might contain items otherwise called for by the warrants, off-site searching was limited to "searching for the items described in paragraph I [to Attachment B]." Dkt. Nos. 121-1 at 7, 121-2 at 7. Attachment B allowed for the seizure of "[p]asswords, encryption keys, and other access devices that may be necessary to access the computer equipment." *Id.* Further, Attachment B explicitly states that during the searches of the target locations, "law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the TARGET LOCATIONS to the sensor of the subject device and/or to hold the device in front of their faces" for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by the warrants. *Id.*

Agents executed the search warrants on June 28, 2024. The defendant was present at Skin Beaute Med Spa's Randolph office at the time of the search and agreed to an interview with agents. *See* Dkt. No. 121-6. During the Randolph search, agents found and seized (among other items): various injectable prescription drugs and devices, including counterfeit fillers (Sculptra, Juvederm, and Restylane) and empty vials of counterfeit Botox; business records, including patient files, consent forms, and bank records; and various electronic devices. *See* Dkt. No. 121-4. Specifically, agents seized the following devices:

- Apple iPhone 15 Pro Max – S/N C54YRLQ2D (the defendant's primary cell phone with phone number ending in 7839);
- Apple iPhone 14 Pro Max – S/N K37M7WWQ9V (a secondary personal cell phone belonging to the defendant); and

- Apple iPhone 11 Pro – M/N MWCU2LLA/A2160, S/N C39271Y7N648 (a cell phone used by the Randolph office front desk).

In addition, agents imaged an Apple computer located in the office's reception area while on site. *See id.* at 7. In connection with the search of Skin Beaute Med Spa's Easton location, agents seized (among other items): counterfeit Juvederm and empty vials of counterfeit Botox; business records, including a customer list and Botox and filler consent forms; and two electronic devices—an HP computer and a USB/thumb drive. *See* Dkt. No. 121-5.

**B. November 1, 2024 Searches of the Defendant's Home and Vehicle**

On October 31, 2024, Special Agent Hendricks submitted an affidavit in support of: (1) an application for a criminal complaint charging the defendant with the same offenses now charged in the indictment and a warrant for her arrest; and (2) applications for warrants to search the defendant's home in Stoughton and her vehicle. Dkt. No. 121-10. That affidavit incorporated by reference and attached as an exhibit Special Agent Hendricks's June 25, 2024 affidavit. *See id.* ¶ 18. Like the prior affidavit, the October 31, 2024 affidavit describes FDA-OCI's investigation of the defendant and the evidence obtained in connection therewith. It contains much of the same information as that set forth in paragraphs one through 13 *supra*, including information regarding Skin Beaute Med Spa's website,[2] Instagram accounts, and use of Vagaro. *See id.* ¶¶ 32–37.

The affidavit also describes agents' execution of the June 2024 search warrants and witness interviews conducted in connection with those searches, including agents' interview of the defendant. *Id.* ¶¶ 42–57. As stated in the affidavit, during that interview, the defendant confirmed that she purchased Botox and other injectable drugs and devices from a Chinese supplier through

[2] The affidavit notes that as of October 2024, the majority of the narrative on the Skin Beaute Med Spa website was in Portuguese rather than in English as it had been previously. *Id.* ¶ 32 n.12.

the online marketplace Alibaba *Id.* ¶ 49. She also confirmed Skin Beaute Med Spa's use of Vagaro (in addition to another platform called "Booker") and stated that she used her cell phone to review and schedule client appointments through Vagaro. *Id.* ¶ 50. In addition, the affidavit describes certain digital evidence obtained from the devices seized in connection with the June 28, 2024 searches, including: videos and images of the defendant performing injections; communications between the defendant and a Chinese supplier of counterfeit prescription drugs and devices (including messages discussing purchase prices and attempts to avoid parcel seizures by U.S. Customs and Border Protection ("CBP")); and communications between the defendant and several Skin Beaute Med Spa clients who complained about adverse health events resulting from procedures she performed on them. *Id.* ¶¶ 58–63.

Special Agent Hendricks's affidavit also sets forth "evidence of ongoing unlawful activity"—*i.e.*, evidence that the defendant was continuing to illegally administer counterfeit prescription drugs and devices after agents executed searches of her business. *Id.* ¶¶ 64–67. For example, paragraph 64 of the affidavit states as follows:

> On or about October 17, 2024, I reviewed the Instagram page for Skin Beaute Med Spa's Randolph office (@skinbeautemedspa) and noticed approximately ten posts advertising or otherwise referencing Botox and dermal filler services that post-date the June 28, 2024 searches of Skin Beaute Med Spa's Randolph and South Easton offices. For example, a July 1, 2024 post depicted before and after photos from "[t]oday's Botox treatment," and an October 9, 2024 post depicted before and after photos from "[o]ur [filler] result today." The latter post stated, "[w]ith our Filler treatment we achieve a satisfactory result," and invited potential clients to "[a]ccess our website and schedule your appointment."

Finally, with respect to the seizure of electronic devices, the affidavit includes the same statements as those set forth in paragraphs 11 through 13 *supra* (from the prior affidavit), except that the October 31, 2024 affidavit references the defendant's Apple iPhones (plural) and her statements to agents regarding her use of Vagaro (and Booker), as set forth above. *Id.* ¶ 74–76.

The October 31, 2024 warrants authorized law enforcement to search the defendant's home and vehicle for "[a]ll records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of: 21 U.S.C. § 331(i)(3) (sale or dispensing, or holding for sale or dispensing, of a counterfeit drug); 21 U.S.C. § 331(fff)(3) (sale or dispensing, or holding for sale or dispensing, of a counterfeit device); and/or 18 U.S.C. § 545 (importing or receiving merchandise knowing that it has been imported into the United States contrary to law[)], all from January 1, 2021, through present[.]" Dkt. Nos. 121-8 at 5, 121-9 at 6. Attachment B to each of the warrants contains a similar illustrative list of the types of items to be seized as that set forth in Attachment B to the prior warrants. *Compare* Dkt. Nos. 121-8 at 5–6, 121-9 at 6–7 *with* Dkt. Nos. 121-1 at 6, 121-2 at 6.[3] It also contains the same language with respect to computer hardware. *Compare* Dkt. Nos. 121-8 at 6–7, 121-9 at 7–8 *with* Dkt. Nos. 121-1 at 7, 121-2 at 7.

Agents arrested the defendant and executed the search warrants on November 1, 2024. During the search of the defendant's home, agents found and seized, among other items, patient records, a CBP seizure notice, and counterfeit Juvederm. *See* Dkt. No. 121-11. Agents also seized for a second time the defendant's primary cell phone, which they had returned to her after performing an off-site extraction in connection with the June 28, 2024 search/seizure. *See id.*[4]

[3] Specifically, like Attachment B to the prior warrants, Attachment B to the residence/vehicle warrants lists, among other items, records and tangible objects pertaining to: customers who received treatments or services involving products intended to be administered through injection for cosmetic or other purposes; payments for services involving such products; the purchase, importation, and source of such products; and/or adverse health events related to such products, including but not limited to customer complaints. Dkt. Nos. 121-8 at 5–6, 121-9 at 6–7.

[4] No evidence was seized from the defendant's vehicle.

## II. APPLICABLE LAW

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[5] "A warrant application must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element,[6] and (2) enumerated evidence of the offense will be found at the place searched -- the ... 'nexus' element." *United States v. Lindsey*, 3 F.4th 32, 39 (1st Cir. 2021).[7]

"A showing of probable cause may be premised on either direct or circumstantial evidence or some combination of the two." *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Such a showing leaves ample room for reasonable inferences based on common experience: an affidavit submitted to show probable cause need not point to some straight-line connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way." *Id.* (citing *Florida v. Haris*, 568 U.S. 237, 244 (2013)).

With respect to the nexus element, "a court need only determine that there is a 'fair probability' -- not certainty -- that evidence of a crime will be found in a particular location based on the totality of the circumstances." *Lindsey*, 3 F.4th at 39. "The nexus between the alleged crime and place to be searched may be inferred from the type of crime, the nature of the items sought, ... and normal inferences as to where a criminal would hide [evidence of a crime]." *Id.*

---

[5] In *Riley v. California*, 573 U.S. 373, 386 (2014), the Supreme Court held that law enforcement may not, without a warrant, search digital information on a cell phone seized incident to a lawful arrest.

[6] The defendant does not contest probable cause as to the commission element.

[7] Unless otherwise noted, all alterations, internal citations, and quotation marks are omitted.

The Supreme Court has held that "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236; *see also United States v. Feliz*, 20 F. Supp. 2d 97, 101 (D. Me. 1998), *aff'd*, 182 F.3d 82 (1st Cir. 1999) ("In assessing whether a substantial basis existed for finding probable cause to issue the warrant, the Court reviews the issuing judge's determination of probable cause with great deference.").

To satisfy the Fourth Amendment's particularity requirement, a warrant: "(1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013). However, "[a] court must review the warrant's language as a whole in determining whether the warrant satisfies the particularity requirement," and "a warrant need only provide reasonable specificity as to the categories of documents to be searched." *United States v. Klyushin*, 643 F. Supp. 3d 261, 269–70 (D. Mass. 2022) (Saris, J.).

## III. ARGUMENT

### A. The June 2024 Affidavit Established Probable Cause to Believe That Evidence of the Crimes under Investigation Would Be Found on the Three Seized Cell Phones.

The defendant concedes that Special Agent Hendricks's June 2024 affidavit established probable cause to believe that evidence of the crimes under investigation would be found on her primary cell phone but contends that the requisite nexus was lacking as to the other two phones seized in connection with the search of Skin Beaute Med Spa's Randolph office.[8] That contention is meritless. The defendant's argument hinges on two premises: (1) that because the other two

[8] Notably, the defendant does not seek suppression of evidence obtained from the other devices seized in connection with the Randolph and Easton searches.

phones were not specifically identified in the affidavit, there was not probable cause to search them; and (2) the only link between those two phones and the crimes under investigation are general observations based on Special Agent Hendricks's training and experience. Both are incorrect.

First, the affidavit contains numerous specific facts indicating a fair probability that one or more phones located at Skin Beaute Med Spa's Randolph office would contain evidence of the target offenses. As set forth above, clients communicated with the office by phone. For example, when Client 1 (who had received a lip filler procedure at the Randolph office) became concerned that the defendant may not have been qualified to perform injections, she called the defendant to request a copy of the prescription for the filler used in connection with the procedure. In addition, the SOI who assisted in law enforcement's investigation communicated with multiple employees of the Randolph office via phone about making an appointment with the defendant for Botox and filler procedures. It was therefore reasonable to conclude that Skin Beaute Med Spa clients communicated with the defendant and her employees by phone, including about booking appointments and adverse health events resulting from procedures the defendant performed. Moreover, if the defendant and her employees communicated with clients via phone, it was also reasonably likely that they communicated with product suppliers (including suppliers of counterfeit prescription drugs and devices) by phone.

Further, as stated explicitly in the affidavit, "Skin Beaute Med Spa's online presence, including its website and social media accounts, and its use of Vagaro as a business management platform" allowed for the commonsense inference that the defendant "used one or more computers and/or smartphones to commit, communicate about, and/or store records relating to" the crimes under investigation. Dkt. No. 121-3 ¶ 66. It was reasonable to believe that the defendant and/or

one or more of her employees used a computer or smartphone to create the Skin Beaute Med Spa website, which contained false representations regarding the defendant's training and qualifications and specifically offered Botox and filler services. The same is true of Skin Beaute Med Spa's Instagram accounts. It was fair to infer that the defendant and/or her employees created and maintained the accounts, which promoted Botox and filler services, using one or more phones. And it was a logical inference that the photographs, videos, and any other content posted to Instagram would be found on such devices (*e.g.*, photos and/or videos of the defendant performing injections). *See Adams*, 971 F.3d at 33 ("Direct evidence is not necessary to ground a probable cause determination where, as here, the import of circumstantial evidence is obvious.").

Finally, the affidavit contains specific facts relating to Skin Beaute Med Spa's use of Vagaro to offer, and schedule appointments for, Botox and filler services to be performed by the defendant. While Skin Beaute Med Spa's Vagaro account identified the defendant's primary cell phone number ending in 7839 as a contact number, it was fair to infer that the account may have been accessed/used by other devices, as Skin Beaute Med Spa employees would not necessarily have access to the defendant's personal phone to manage client appointments, payments, *etc.*[9] Additionally, the defendant's apparent use of one or more phones to communicate with clients, create and maintain an online presence for her business, and manage client appointments made it all the more likely that she also used one or more phones for other aspects of her unlawful business and that evidence of her criminal conduct would therefore be found on such device(s).

[9] The defendant argues that the affidavit provides no support for the assumption that she might have used more than one phone to conduct her business. Dkt. No. 121 at 11. That argument misses the mark. The relevant inquiry is not whether the defendant used more than one phone to engage in criminal conduct, but, rather, whether evidence of the defendant's criminal conduct could reasonably be expected to exist on more than one phone.

These specific facts are more than sufficient to establish the required nexus between the target offenses and the devices seized from Skin Beaute Med Spa's office, particularly when viewed in light of the more general observations contained in the affidavit (*e.g.*, that businesses frequently use computers/smartphones to conduct their operations, and that businesses and individuals commonly store items of the type described in Attachment B on such devices). *See Adams*, 971 F.3d at 32 (noting that the First Circuit has "with a regularity bordering on the echolalic, endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination"). It is exactly this type of combination of general observations with specific facts that courts have found more than sufficient to support a finding of probable cause. Indeed, courts have upheld probable cause determinations based on far less. *See, e.g., id.* at 33–34 (evidence that defendant was engaged in drug trafficking and that multiple cell phones recovered from his car "were tools of the trade and, thus, likely to contain evidence of criminal activity" was "more than enough" to establish probable cause to search the phones); *Lindsey*, 3 F.4th at 39–40 (evidence that defendant had been engaged in drug dealing and had more than one cell phone, coupled with the fact that it is common for drug dealers to use multiple cell phones to conceal their drug business, was enough to support a fair inference that the cell phones would contain evidence of drug dealing). This case is a far cry from those where courts have expressed skepticism that the requisite nexus can be established solely by evidence that the defendant committed a crime and an agent's general averment that in their training and experience it is common for such offenders to have incriminating evidence on their cell phone(s). Here the affidavit connected "a series of dots in a commonsense way" and suggested a fair probability that the seized devices would contain evidence of the target offenses. *Adams*, 981 F.3d at 32.

Lastly, the defendant cites no support—and the government is aware of none—for the proposition that to establish the requisite nexus, an affidavit must identify with specificity the particular electronic device(s) on which relevant evidence is likely to be found. The law does not require law enforcement to identify in advance each computer and/or phone located at the premises to be searched and predict which is/are likely to contain relevant evidence. *See United States v. Austin*, 640 F. Supp. 3d 171, 177 (D. Mass. 2022) (Gorton, J.) (affidavit explaining that evidence of the subject offenses was likely to be found on *a* cell phone, computer, hard drive *or* other media storage device located on the defendant's person or at his residence demonstrated the required nexus); *see also United States v. Mulcahey*, No. CR 15-10112-RGS, 2015 WL 9239755, at *1 (D. Mass. Dec. 17, 2015) (warrant clearly identified the property to be searched and seized as "all computers and computer storage devices located at defendant's business address"). Indeed, to identify each device by make, model, phone number, and/or user would be impractical if not impossible in most cases. And the fact that Special Agent Hendricks's affidavit *did* specifically identify one of the phones by make/number is immaterial. The warrants authorized agents to search *any* electronic device that they reasonably believed was likely to contain items of the type described in Attachment B. Such a reasonable belief can obviously extend to more than one phone, and, for all the reasons set forth above, it did here.

### B. The Warrants Satisfied the Fourth Amendment's Particularity Requirement and Were Not Overly Broad.

The defendant next argues that both sets of warrants allowed for overbroad searches of the seized devices. Not so. Far from authorizing a wide-ranging seizure, the warrants here limited executing agents to seizing evidence, fruits, and instrumentalities of a limited number of enumerated criminal offenses for the limited time period of January 1, 2021 to the present. The warrants further limited agents' discretion: they described numerous separate categories to guide

them about the types of items that would constitute evidence of the target offenses. This is the level of particularity that the Constitution requires. *See, e.g.*, *Klyushin*, 643 F. Supp. 3d at 270 (warrants that authorized the seizure of evidence of six particular crimes for a limited time period and listed 19 examples of the types of records that could be searched/seized satisfied the particularity requirement); *United States v. Kanodia*, No. CR 15-10131-NMG, 2016 WL 3166370, at *5 (D. Mass. June 6, 2016) (warrant that set forth 14 categories of records and data to be seized, along with references to specific crimes, was sufficiently particular, even without a temporal limitation); *United States v. Tsarnaev*, 53 F. Supp. 3d 450, 456–57 (D. Mass. 2014) (O'Toole, J.) (similar); *United States v. Rondeau*, 626 F. Supp. 3d 403, 416 (D. Mass. 2022) (Hillman, J.) (similar).

In short, contrary to the defendant's contention, agents were appropriately limited in what types of content they could search for on the phones. And they were permitted to search anywhere on the phones that they reasonably believed such content might be found. *See United States v. Ulbricht*, No. 14-CR-68 KBF, 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017) ("It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized.") (noting that a warrant authorizing the search of the entirety of a laptop, Facebook account, and Gmail account was simply the digital equivalent of searching an entire house for narcotics, an entire file cabinet for evidence of money laundering, or an entire car for weapons); *United States v. Kormah*, No. CR 21-40012-TSH, 2023 WL 1490372, at *11 (D. Mass. Feb. 1, 2023) ("[W]hile law enforcement may be limited in that they can only look for and seize the information sought, they are not limited as to where on the phone they may search for such information."); *see also Rondeau*, 626 F. Supp. 3d at 416 (a

warrant authorizing the seizure of computer equipment for later off-site searching is not overbroad or unreasonable so long as the probable cause showing demonstrates a "sufficient chance of finding some needles in the computer haystack") (quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999)).[10]

Nor is there any merit to the defendant's argument that the warrants' time limitation (January 1, 2021 to present) was overbroad. Special Agent Hendricks's June 2024 affidavit stated that he had probable cause to believe that the defendant had been engaging in the criminal conduct at issue since *at least* March 2021. That was based on the Vagaro records, which, as described in the affidavit, indicated that the defendant created a Vagaro account for Skin Beaute Med Spa on or about March 3, 2021, and that Botox and filler appointments were booked through Vagaro beginning in March 2021. Dkt. No. 121-3 ¶¶ 47, 50–51. The fact that the defendant was providing Botox and filler services so close in time to when she began using the Vagaro platform to manage her business fairly suggests that she may have been providing such services in the months immediately prior. Even if that were not the case, the warrants' expansion of the time period by only two months to capture the full 2021 calendar year does not render them overly broad.[11]

Finally, even if the defendant's arguments regarding lack of particularity and overbreadth had merit, the agents who executed the warrants reasonably relied on them in good faith, and

[10] *See also United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir. 2009) (despite efforts to establish *ex ante* search protocols for computer drives to limit "overseizures," given the capacity of a computer to store and intermingle vast amounts of data, at bottom "there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders"); *United States v. Richards*, 659 F.3d 527, 539-540 (6th Cir. 2011) (same); *United States v. Stabile*, 633 F.3d 214, 239-240 & n.13 (3d Cir. 2011) (same).

[11] Even if it did, "the remedy in the case of a seizure that casts its net too broadly is … not blanket suppression but partial suppression." *United States v. Aboshady*, 951 F.3d 1, 9 (1st Cir. 2020) (quoting *United States v. Falon*, 959 F.2d 1143, 1149 (1st Cir. 1992)).

suppression would therefore be unwarranted under the good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984); *see also United States v. Coombs*, 857 F.3d 439 (1st Cir. 2017) ("[T]he purpose of suppression is to deter police misconduct, and when law enforcement officers have obtained a search warrant in good faith and acted within its scope, there is nothing to deter[.]"). The defendant contends that agents failed to abide by the terms of the warrants by searching "all records on the phones, which included data dating as far back as 2003." Dkt. No. 121 at 15. That is incorrect. The only basis for this contention is the fact that the government produced to the defendant in discovery copies of the full images of *her* phones—which is why *the defense team* has been able to review content dating back to 2003. This in no way suggests that the government has searched or seized anything outside the scope of the warrants.

### C. Law Enforcement Agents Did Not Use Biometric Facial Data to Unlock the Defendant's Phone, and Even If They Had, the Warrants Expressly Authorized Them to Do So.

The defendant's final argument—that suppression is warranted because in connection with both the June 28, 2024 search of Skin Beaute Med Spa's Randolph office and the November 1, 2024 search of her home, agents used biometric facial data to unlock her primary phone without her consent in violation of her Fifth Amendment rights—is moot. At no point did agents use biometric data of any kind to access any of the devices they seized. The defendant's sworn affidavit claiming otherwise (Dkt. No. 121-7) is, at best, incorrect. As set forth in the affidavit submitted by FDA-OCI Special Agent Robert Percheski, who was responsible for the seizure of electronic devices in connection with the searches, law enforcement accessed the defendant's iPhone 15 using a passcode in both instances. *See* Percheski Aff. (attached hereto as Exhibit A).

During the June 28, 2024 search, the defendant voluntarily provided her passcode, which Special Agent Percheski used to unlock the phone in her presence. *Id.* The defendant's assertion that she "refused to provide her phone passcode," Dkt. No. 121 at 5, is belied not only by Special Agent Percheski's affidavit but also by the "Digital Forensics Unit Evidence Acquisition Worksheet" attached as Exhibit 1 thereto, which Special Agent Percheski completed in connection with the seizure/extraction of the phone. The "device owner and passwords" section of the worksheet identifies the passcode to the phone as "000000." If the defendant had not provided her passcode, that field of the worksheet would be blank.

During the November 1, 2024 search, the defendant did decline to provide the passcode to her phone. However, after first unsuccessfully attempting to use the defendant's prior passcode ("000000"), Special Agent Percheski was later able to unlock the phone by entering the passcode "111111." *See* Percheski Aff. (attached hereto as Exhibit A). In other words, he guessed her passcode correctly. This is corroborated by the separate "Digital Forensics Unit Evidence Acquisition Worksheet" that Special Agent Percheski completed in connection with the second seizure/extraction of the phone, which is attached as Exhibit 2 to his affidavit. As reflected in the "device owner and passwords" section of the worksheet, at the time of the search, Special Agent Percheski wrote "000000 (maybe)" in the password field. He later crossed that out and wrote "111111." A notation dated November 4, 2024 on the second page of the worksheet reads: "used pw '111111' to unlock."

In any event, even if agents had held the defendant's phone up to her face to unlock it, the use of biometric data in such circumstances is not only permissible under current First Circuit law but was also expressly authorized by the terms of the warrants. The defendant, acknowledging that courts are split on the issue, relies on a single D.C. Circuit case for the proposition that the

compelled unlocking of a cell phone using biometric data is testimonial in nature and therefore runs afoul of the Fifth Amendment. *See United States v. Brown*, 125 F.4th 1186, 1199–1204 (D.C. Cir. 2025). That is not the law in the First Circuit, and at least one other Circuit has reached a different conclusion. *See United States v. Payne*, 99 F.4th 495, 507–513 (9th Cir.), *cert. denied*, 145 S. Ct. 605, 220 L. Ed. 2d 237 (2024) (use of defendant's thumb to unlock his cell phone, while compelled and incriminating, was not testimonial and thus did not violate the Fifth Amendment).[12] Moreover, even if the First Circuit were to issue an opinion tomorrow adopting the D.C. Circuit's reasoning in *Brown*, the warrants here explicitly authorized agents to use the defendant's biometric data to unlock her devices. Had they done so, there would be no question that they acted in good faith, and there would be no basis for suppression.[13]

## IV. CONCLUSION

For the foregoing reasons, the defendant's motion to suppress should be denied in its entirety.

---

[12] The *Brown* court maintained that its holding was consistent with the Ninth Circuit's decision because in *Payne*, instead of instructing the defendant to open his phone, as the FBI did in *Brown* (with which instruction the defendant complied by placing his thumb on his phone), police forcibly grabbed Payne's thumb and used it to unlock his phone. *See* 125 F.4th at 1204 n.2 (noting that the Ninth Circuit had recognized that the outcome in *Payne* may have been different had the officer required Payne to independently select the finger that he placed on the phone). To the extent this distinction is consequential, the act of holding up a phone to an individual's face to unlock it—as the defendant claims agents did here—is more akin to taking an individual's finger/thumb and placing it on their phone than to instructing the individual to unlock their phone.

[13] In *Brown,* the D.C. Circuit declined to decide whether the good faith exception to the exclusionary rule extends to violations of the Fifth Amendment (as the district court there found that it did), but noted that the government could not show good faith because "at no point did the officer claim to have relied upon the warrant or any other relevant legal authority as empowering him to compel [the defendant] to open his phone," nor could he have, as the warrant "expressly withheld authority" to demand that the defendant provide the password or identify the specific biometric features that could be used to unlock the device unless agents made clear that providing any such information was voluntary and that the defendant was free to refuse the request. 125 F.4th at 1206–07.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: */s/ Leslie A. Wright*
LESLIE A. WRIGHT
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

*/s/ Leslie A. Wright*
LESLIE A. WRIGHT
Assistant United States Attorney