UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>REBECCA FADANELLI,<br><br>Defendant | Criminal No. 24-10352-JEK<br><br>*Leave to File Exhibits Under Seal Granted on August 26, 2026* |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Over the course of more than three years, defendant Rebecca Fadanelli put the health and safety of hundreds of people at risk. She deceived clients of her business who trusted her, falsely claiming to be a licensed medical professional using authentic prescription drugs and devices for injection procedures that she had no qualifications to perform. She consistently put professional success and personal financial gain before her clients' safety, administering thousands of injections using counterfeit botulinum toxin and dermal filler products, for which these clients paid more than $1 million. Many of these procedures resulted in adverse health effects, with multiple clients ending up in the hospital. When clients complained to her about these results, the defendant showed a callous disregard for their health, dismissing their concerns, claiming to be "a professional . . . doing everything right." This lack of accountability, much less remorse, has persisted throughout the course of these proceedings. Rather than own up to her crimes, and notwithstanding her guilty plea, the defendant has continually sought to avoid the consequences of her actions, including by continuing to deny the essential facts underlying her offenses of conviction. This is a troubling pattern that suggests a failure to understand the serious nature of her criminal conduct, raising significant concerns about her risk of recidivism.

For her actions, the government recommends that the Court impose the following sentence: incarceration for 57 months, two years of supervised release, and restitution and forfeiture each in the amount of $1,001,562.45, in addition to the mandatory special assessment of $800.[1] The imposition of a significant prison sentence is critically important here. The Court should hold the defendant accountable for her actions and the harm they caused. This case also presents the Court with the opportunity to deter others operating in the exploding med spa space from engaging in similar conduct and to assure the public that those who put their health at risk by performing unauthorized procedures using unknown, potentially dangerous substances will face serious consequences. For all the reasons set forth below, the government's recommended sentence would properly reflect the seriousness of the defendant's crimes, promote respect for the law, provide just punishment, and afford adequate deterrence. The government does not take its responsibility to recommend an appropriate sentence lightly and firmly believes that its recommendation here is not only fair, but no more than necessary to see justice done.

## I. THE OFFENSE CONDUCT

The offense conduct is summarized below and set forth in detail in the presentence investigation report ("PSR"). *See generally* PSR ¶¶ 12–27. During the relevant period, the defendant, an aesthetician, owned and operated Skin Beaute, Inc., doing business as Skin Beaute Med Spa ("Skin Beaute"), with locations in Randolph and South Easton, Massachusetts. *Id.* ¶¶ 12–13. In addition to various spa services and cosmetic procedures, beginning in at least March 2021

[1] The government has filed a motion for an order of forfeiture and respectfully requests that the Court enter the proposed order attached thereto. *See* Dkt. Nos. 171, 171-1. The government is not recommending a fine in light of the substantial restitution and forfeiture amounts.

and continuing through in or around November 2024 (when she was arrested),[2] the defendant also offered botulinum toxin and dermal filler injections to Skin Beaute clients, despite having no license to perform injections or otherwise administer or dispense prescription drugs or devices. *Id.* ¶¶ 12–13, 15.[3]

The defendant falsely represented to both clients and employees of Skin Beaute that she was a licensed nurse. *Id.* ¶ 15. She also misrepresented the identity and safety of the substances she was using for the injection procedures she performed, claiming that she was injecting authentic Botox and FDA-approved dermal fillers such as Sculptra, Restylane, and Juvéderm, when, in fact, she was using counterfeit versions of these products, many of which she imported from China and Brazil. *Id.* ¶ 16. Indeed, there is no record of the defendant ever having purchased authentic prescription drugs or devices from the manufacturers of these FDA-approved products. *Id.*

After United States Customs and Border Protection ("CBP") began seizing international shipments of counterfeit prescription drugs and devices (falsely declared as containing items such as sunscreen or plastic bottles) addressed to the defendant's home and to Skin Beaute's two locations, and notified the defendant that the parcels had been seized because the products contained therein were misbranded and unapproved in violation of FDA regulations, she took steps to conceal her ongoing criminal activity. *Id.* ¶¶ 18–22. Specifically, the defendant caused various suppliers of counterfeit prescription drugs and devices, including a supplier offering these products

---

[2] As detailed below, even after her arrest, the defendant continued to engage in this conduct on at least one occasion, in May 2025, when she performed an injection procedure on a client at her (the defendant's) home, which ultimately led to revocation of the defendant's pretrial release.

[3] The FDA regulates botulinum toxin products, including Botox (manufactured by Allergan), as prescription drugs. The FDA regulates dermal fillers, including Sculptra and Restylane (manufactured by Galderma) and Juvéderm (manufactured by Allergan), as prescription medical devices. PSR ¶ 14.

on the Chinese-owned online marketplace Alibaba, to use different delivery addresses for the shipments and other individuals' names as the recipients. *Id.* ¶ 22. *See also* Hendricks Aff. ¶¶ 60–62, Oct. 31, 2024 (Dkt. No. 3-1) (describing messages between the defendant and the Alibaba supplier discussing the need to avoid future CBP seizures as well as the potency of certain "batches" of counterfeit Botox).

Records from Skin Beaute's business management platform show that from approximately March 2021 to June 2024, the defendant performed more than 2,700 botulinum toxin and dermal filler injection procedures using counterfeit prescription drugs and devices, resulting in payments from more than 900 Skin Beaute clients totaling $1,001,562.456. PSR ¶ 24. Multiple Skin Beaute clients complained to the defendant about adverse health effects they experienced as a result of injection procedures she performed on them, including injection site adverse reactions, droopy eyes, and hard lumps. *Id.* ¶ 23.

On June 28, 2024, law enforcement agents executed search warrants at both Skin Beaute locations and found various injectable prescription drugs and devices, including products labeled as Botox, Sculptra, Restylane, and Juvéderm, which the manufacturers identified as counterfeit.[4] *Id.*[5] The defendant was undeterred. Despite telling agents that she possessed no additional botulinum toxin or dermal filler products, she continued offering and performing injection procedures up until the time of her arrest on November 1, 2024. *See* Hendricks Aff. ¶¶ 64–67, Oct. 31, 2024 (Dkt. No. 3-1). Even her arrest did not deter her. In May 2025, the defendant violated her conditions of release by performing an injection procedure on a client at her (the defendant's)

[4] Agents also found vials of bacteriostatic water (used to reconstitute, or dilute, Botox) that lab tested positive for methylobacterium, a bacteria that can cause infection.

[5] Likewise, during a search of the defendant's home at the time of her arrest, agents found products labeled as Juvéderm, which the manufacturer identified as counterfeit. PSR ¶ 23 n.5.

home using an unknown substance (which the client reportedly believed to be Sculptra). *See* Dkt. Nos. 106, 115; PSR ¶ 4.[6] After conducting a show cause hearing on October 30, 2025, Magistrate Judge Hennessy found that nothing short of detention would "protect the public and ensure that [the defendant] complies with [her conditions of release]." Dkt. No. 115 at 38:15–18. He ordered the defendant to self-surrender the day after the hearing, an order with which the defendant failed to comply, ultimately reporting several days later after Judge Hennessy issued a warrant for her arrest (prior to its execution). PSR ¶¶ 4–5. The defendant has remained in custody since that time (despite repeatedly seeking release), and, in April 2026, she pled guilty to the eight-count indictment pursuant to a plea agreement with the government. *Id.* ¶¶ 6–7.

## II. THE SENTENCING GUIDELINE RANGE

The parties and the Probation Office agree that, pursuant to the calculation set forth below, the defendant's total offense level under the Sentencing Guidelines is 23, yielding a guideline imprisonment range of 46 to 57 months:

- Base offense level of six (USSG §§ 2N2.1, 2B1.1(a)(2) (utilizing the cross-reference at USSG § 2N2.1(c)(1));[7]
- Increase of 14 because the loss attributable to the offenses is more than $550,000 but not more than $1,500,000 (USSG § 2B1.1(b)(1)(H));[8]

[6] The conditions of the defendant's release prohibited her from: (1) having contact with any victims or witnesses, including Skin Beaute clients who had received botulinum toxin and/or dermal filler injections; (2) performing injection procedures; and/or (3) purchasing, selling, and/or administering injectable cosmetic products (among other conditions). *See* Dkt. No. 11.

[7] The cross-reference at USSG § 2N2.1(c)(1) applies because the defendant's offenses involved fraud. Specifically, the defendant defrauded clients of Skin Beaute by falsely representing that she was a nurse licensed to perform injections and by misrepresenting the identity and safety of the substances she was using for clients' injection procedures. *See* PSR ¶ 33.

[8] The loss figure (which here is the same as the restitution and forfeiture amounts) is based on records from Skin Beaute's business management platform and reflects the total amount paid by Skin Beaute clients for botulinum toxin and dermal filler injection procedures performed by the defendant from in or around March 2021 through in or around June 2024. *See* PSR ¶ 34.

- Increase of two because the offenses involved ten or more victims (USSG § 2B1.1(b)(2)(A)(i));[9]
- Increase of two because the offenses involved the conscious or reckless risk of death or serious bodily injury (USSG § 2B1.1(b)(16)(A));[10]
- Increase of two because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offenses (USSG § 3B1.3);[11] and
- Decrease of three for acceptance of responsibility (USSG §3E1.1).[12]

---

[9] The victims are the more than 900 clients of Skin Beaute who paid the defendant for botulinum toxin and dermal filler injection procedures. *See* PSR ¶¶ 28, 35.

[10] As noted above and discussed further below, multiple Skin Beaute clients suffered adverse health effects as a result of injection procedures the defendant performed. Further, the serious health risks posed by counterfeit and/or mishandled botulinum toxin products are well known. *See* PSR ¶¶ 23, 36 (defendant disregarded these risks and performed the procedures for profit). *See also, e.g.,* https://www.fda.gov/drugs/drug-alerts-and-statements/counterfeit-version-botox-found-multiple-states?ACSTrackingID=USCDC_511-DM126877&ACSTrackingLabel=HAN%20507%20-%20COCA%20Subscribers&deliveryName=USCDC_511-DM126877 (last visited August 24, 2026); https://www.cdc.gov/han/2024/han00507.html (last visited August 24, 2026).

[11] *See* PSR ¶ 38 ("[T]he defendant held a position of trust with respect to her clients, and she abused this position of trust when she deceived her clients into believing that she was licensed to perform injections and that she was using authentic products for the injections."). The guideline application notes for the "abuse of position of trust" adjustment specifically contemplate its application in the context of a defendant who falsely holds herself out as a licensed medical practitioner: "This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not. For example, the adjustment applies in the case of a defendant who . . . perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician. In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately." USSG § 3B1.3, cmt. n.3. Even before this application note took effect in 1998, the First Circuit had held that the enhancement applies equally to "imposters." *See United States v. Gill*, 99 F.3d 484, 487–89 (1st Cir. 1996). *See also United States v. Reyes-Rivera*, 812 F.3d 79, 86 (1st Cir. 2016) ("Application note 3 clarifies that the enhancement applies equally to those holding a 'sham position of trust.'"); *United States v. Ghertler*, 605 F.3d 1256, 1265–66 (11th Cir. 2010) (discussing the history and purpose of application note 3).

[12] While this calculation includes an adjustment for acceptance of responsibility pursuant to the terms of the parties' plea agreement, as noted above and discussed further below, the

## III. THE GOVERNMENT'S SENTENCING RECOMMENDATION

The relevant factors under 18 U.S.C. § 3553(a) necessitate the imposition of a significant term of imprisonment in this case. Given the serious nature of the defendant's crimes, her history and characteristics, and the need for both general and specific deterrence, among other considerations, the government's recommended sentence—incarceration at the high end of the guideline range—is sufficient but not greater than necessary to achieve the goals of sentencing.

### A. The Nature and Circumstances of the Defendant's Crimes Warrant a Significant Term of Imprisonment.

The defendant's crimes put the health and safety of hundreds of people at risk. This case is not about cosmetic treatments that did not work effectively. It is about the defendant illegally injecting counterfeit prescription drugs and devices into her clients' faces, in some cases resulting in severe adverse health effects. The defendant was not merely careless. She was deceptive and callously indifferent to the impact her actions could and did have on others, on clients who trusted her. And this deception, this wanton disregard, was not a one-time occurrence. The defendant stands before this Court for sentencing not as a result of having committed an isolated crime of opportunity. This was not a mistake or a momentary lapse of judgment. The defendant consistently chose—over a period of more than three years—to prioritize professional success and personal profit over the health and safety of her clients, all the while providing false assurances regarding

---

defendant has failed to fully accept responsibility for her crimes. The fact that she pled guilty does not in and of itself entitle her to a reduction for acceptance of responsibility. *See United States v. Muriel*, 111 F.3d 975, 982 (1st Cir. 1997) ("A defendant who pleads guilty is not entitled to a downward adjustment for acceptance of responsibility as a matter of right."). Where a defendant "has resorted to half-truths or evasions from the truth in an effort to minimize his or her culpability," courts have the discretion to deny the reduction. *Id.* at 982–83. *See also United States v. Gadson*, 77 F.4th 16, 22–23 (1st Cir. 2023) (no clear error in district court's denial of reduction for acceptance of responsibility where defendant pled guilty well in advance of trial but disputed his role in the scheme).

her training and qualifications and the authenticity of the substances she was injecting into their faces.

The defendant's conduct posed a serious public health risk. The risks of injecting counterfeit botulinum toxin in particular—as well as incorrect dosing and/or improper administration of botulinum toxin injections—are well known. The FDA and CDC have issued warnings about potential harm resulting from the use of such products and/or from injections performed by unlicensed or untrained individuals or administered in non-healthcare settings, such as homes or spas.[13] One such risk is botulism, a rare and dangerous illness that can result in life-threatening symptoms, including blurred or double vision, drooping eyelids, slurred speech, paralysis, and/or difficulty swallowing or breathing.

The risk here was not just theoretical. Numerous Skin Beaute clients suffered adverse health effects as a result of injections administered by the defendant, some of whom were hospitalized and many of whom required follow-up care from licensed medical practitioners. For example:[14]

- Client D.S. went to the emergency room after receiving botulinum toxin injections from the defendant and, several days later, experiencing severe facial swelling at the injection sites in addition to headaches, weakness, and other fever-like symptoms. Hospital staff told D.S. that she had a severe infection. D.S. was transferred to a different hospital for treatment, where she stayed for a period of weeks. *See* Exhibit A (photos filed under seal).

- Client A.C. was hospitalized for four days after receiving botulinum toxin injections from the defendant and experiencing drooping/paralysis on one side of her face, double vision,

---

[13] *See, e.g.*: https://www.cdc.gov/han/2024/han00507.html (last visited August 25, 2026); https://www.cdc.gov/botulism/outbreaks/harmful-reactions-botox-injections/details.html (last visited August 25, 2026); https://www.fda.gov/drugs/drug-safety-and-availability/counterfeit-version-botox-found-multiple-states (last visited August 25, 2026); https://www.fda.gov/news-events/press-announcements/fda-warns-companies-over-illegal-marketing-botox-and-related-products (last visited August 25, 2026).

[14] This information is as provided and/or reported by victims, and in some instances supported by medical records.

and headaches. A.C. and her family feared she was having a stroke. Hospital staff informed them that it was botulinum toxin and/or the improper injection thereof that was causing her symptoms. A.C.'s symptoms lasted for months, preventing her from driving and going to work. *See* Exhibit B (photo filed under seal).

- Client E.G. went to the emergency room after receiving both botulinum toxin and dermal filler injections from the defendant and experiencing facial swelling and hard lumps (nodules) in various places on her face, including in and around her lips (at least one of which eventually burst). E.G. sought follow-up care from a nurse, a dermatologist, and ultimately a plastic surgeon. Attempts to dissolve the nodules were unsuccessful. *See* Exhibit C (photos filed under seal).

- Client J.A. experienced heaviness and drooping in/around her eyes within a week of receiving botulinum toxin injections from the defendant. She began having difficulty seeing, and her eyesight continued to worsen. J.A. sought treatment from a dermatologist and an ophthalmologist. Her vision was impaired for approximately three months. *See* Exhibit D (photo filed under seal).

- Client C.R. developed a hard ball under her skin after receiving botulinum toxin injections from the defendant in her eyebrow area. C.R.'s primary care physician recommended that she see a cosmetic surgeon for corrective surgery, and C.R. ultimately underwent surgery to have the lump removed. She still has scars from the surgery. *See* Exhibit E (photo filed under seal).

This is merely a representative sample. Many other Skin Beaute clients shared similar stories.

When clients reported these adverse health effects to the defendant, she was non-responsive, discourteous, and/or untruthful. For example, when one client complained about swelling and a lump under her eye (among other things), and asked the defendant what products she had used, the defendant responded with the text messages depicted below:



**Local User** [redacted] ↗ Sent 3/20/2024 10:35:05.000 PM

You can have your dr call me

**Local User** [redacted] ↗ Sent 3/20/2024 10:36:13.000 PM

Here

**Local User** [redacted] ↗ Sent 3/20/2024 10:36:21.000 PM

I just told you

**Local User** [redacted] ↗ Sent 3/20/2024 10:36:26.000 PM

Can you read?!

*     *     *     *

**Local User** [redacted] ↗ Sent 3/20/2024 10:39:34.000 PM

We did Restylane and Botox from Alergan

**Local User** [redacted] ↗ Sent 3/20/2024 10:39:59.000 PM

Im a professional

**Local User** [redacted] ↗ Sent 3/20/2024 10:40:14.000 PM

Im doing everything right

More troubling still, in some instances, the defendant advised clients to return to Skin Beaute for additional treatments. For example, when Client J.A. (discussed above) reported the issues she was experiencing, the defendant told her to come back to Skin Beaute, and when J.A. did, the defendant said she was going to use a laser to "melt" the botulinum toxin she had previously injected. J.A. agreed to the laser treatment, which did nothing to improve her symptoms.

As demonstrated by the victim impact statements submitted in connection with sentencing, the defendant's crimes have had a lasting impact. One Skin Beaute client who developed a "noticeable bump and indentation" on her face after receiving dermal filler injections from the defendant explains the impact these events have had on her as follows:

> What was supposed to make me feel better and more confident . . . has instead left me feeling embarrassed, anxious, and uncomfortable with my appearance . . . I now feel financially taken advantage of, emotionally harmed, and physically damaged. I am also afraid because I do not know what was injected into my body or what future effects it may have. That uncertainty has caused me a lot of distress . . . I trusted Rebecca with my face and my safety, and I believe she violated that trust. The damage she caused has not only affected how I look, but also how I feel about myself . . . This was not just about beauty services. This was about trust, safety, and people's health. Her actions caused real fear, real financial loss, and real emotional pain.[15]

Another client confided in the defendant that she was "feeling unattractive after being a victim of an abusive relationship" and that she had experienced a period of severe depression after losing a family member to suicide. This client explains that she now feels that the defendant "took advantage of [her] already broken spirit and grief, all for her financial gain."[16]

A client who had severe swelling after receiving dermal filler injections from the defendant describes her experience as follows:

---

[15] VIS, Client M.A.

[16] VIS, Client K.F.

> I trusted Ms. Fadanelli with my health and safety . . . I trusted her to be honest about the risks and to provide safe treatment . . . What troubles me most is knowing how dangerous these procedures can be when they are not performed properly . . . The thought that something much worse could have happened to me is frightening . . . Beyond the physical effects, this experience caused emotional distress. I felt anxious, betrayed, and angry. I placed my trust in someone who was supposed to prioritize the health and safety of her clients. Instead, I was left feeling dismissed and unsupported during a frightening situation. I believe Ms. Fadanelli showed a disregard for the well-being of the people who trusted her.[17]

Another client who had an adverse reaction to a filler procedure describes the "considerable anxiety and distress" she experienced upon learning that the products the defendant was using were counterfeit: "I have been forced to question what was injected into my body and whether there could be long-term consequences to my health. The uncertainty has been emotionally difficult and has affected my confidence and peace of mind."[18] These statements show that beyond the physical harm she caused, the defendant's actions have had a significant, enduring psychological impact on the many individuals who trusted her.

Moreover, the defendant's criminal conduct came to an end only because she got caught. As noted above, the defendant continued to illegally import and inject counterfeit prescription drugs and devices *after* federal agents seized numerous shipments, searched both Skin Beaute locations, and questioned the defendant about her business. And she performed at least one illegal injection *after* she was arrested and charged. The defendant's conduct makes clear that she was committed to continuing her illegal activity indefinitely. In short, prior to her detention, no law enforcement action or court order successfully deterred her. If law enforcement had not intervened, the defendant surely would still be performing illegal injections using counterfeit products, putting

---

[17] VIS, Client M.G.

[18] VIS, Client E.S.

her clients at serious risk of harm. All the factors discussed above underscore the serious nature of the defendant's crimes and weigh heavily in favor of a significant term of incarceration.

**B. The Defendant's History and Characteristics Support the Government's Sentencing Recommendation.**

The defendant's personal history and characteristics also support the government's sentencing recommendation. While the defendant has undoubtedly faced challenges in her life, including extremely difficult family circumstances and personal relationships, as described in detail in the PSR,[19] none of these considerations provide any real context, or reasonable explanation, for her criminal conduct. The defendant's history in fact shows a repeated pattern of flouting rules, laws, and even court orders. While she is now a naturalized citizen, the defendant first came to this country on a three-month tourist visa, which she overstayed. PSR ¶¶ 60, 62. And although she has a minimal criminal history, she is not a first-time offender, and her one criminal history point is for driving under the influence of alcohol with a suspended license—which, like the actions underlying her offenses of conviction here, put the health and safety of others at risk. *Id.* ¶¶ 47–49. Moreover, that arrest post-dated multiple other arrests for unlicensed operation of a motor vehicle, including an arrest for driving with a suspended license that occurred approximately five months before the OUI. *Id.* ¶¶ 52, 55. While those charges were ultimately dismissed, the point remains that for decades, the defendant has failed to respect the rule of law.

[19] The PSR also details certain mental and physical health issues, but the defendant reported being "generally healthy," and it appears that she is receiving all necessary treatment and medications while in custody. PSR ¶¶ 81–86. *See also* Dkt. No. 146 at 6–7 (government's opposition to defendant's motion for revocation of detention order arguing that the defendant had not provided any support for her claim that the medical treatment she was receiving in custody was inadequate, and that her preference to be seen by external providers did not warrant temporary release).

More problematic is the defendant's failure to accept responsibility for her crimes. As demonstrated by the text messages excerpted above, the defendant's lack of accountability while engaged in blatantly illegal conduct is stunning. Following her guilty plea, the defendant submitted a letter to the Court showing that that lack of accountability persists. *See* Dkt. No. 169. Rather than take responsibility for her actions, the defendant continues to deny the essential facts underlying her offenses of conviction. For example, she claims that "[a]t no time did [she] intend to falsely represent [herself] as a license[d] nurse." *Id.* at 12. She also claims that she "sincerely did not fully understand that certain conduct relating to the products being imported and used could violate applicable laws." *Id.* at 15. These assertions are simply not credible. Numerous Skin Beaute clients reported to law enforcement that the defendant affirmatively told them she was a nurse. Text messages from one client to the defendant corroborate this:


[redacted]
✓ Received
3/20/2024 10:06:17.000 PM

Good evening Rebecca,
I haven't heard from you which is very disappointing . I returned Monday March 18 after writing to you that I was having problem's and You said I would hear from your office yesterday. I don't understand if you as you said were the owner and nurse at your spa why anyone else would be in charge of this matter. I am

And if she did not understand that it was illegal to import and use counterfeit products, there would be no reason for her to (1) lie to clients about the products she was injecting, claiming, for example, that she had used "Restylane and Botox from Alergan [sic]," or (2) change delivery addresses and recipient names to avoid additional CBP seizures. Remarkably, the defendant claims that "[w]hen [she] bec[a]me aware that there were concerns regarding the legality of certain products, [she] attempted to seek guidance and information regarding how to correct the situation" and "even contacted customs seeking clarification concerning products that had been seized in [an] effort to understand what steps could be taken." Dkt. No. 169 at 15–16. This is completely at odds with

reality. It is true that the defendant tried to get the seized counterfeit products back from CBP so that she could continue injecting them into Skin Beaute clients, and took steps to evade customs going forward. But the notion that she attempted to "correct the situation" is fanciful.

The defendant claims that she is not "attempting to . . . minimize [her] responsibility for the conduct underlying this case." *Id.* at 10. But that is exactly what she is doing. The closest she comes to accepting responsibility is stating that she "pleaded guilty because [she] acknowledge[s] [her] involvement and understand[s] the seriousness of [her] mistakes." *Id.* She then attempts to shift blame to employees—assistants—she hired to work for her at Skin Beaute. *See id.* at 10–11. The evidence in this case is crystal clear as to who was responsible here. Skin Beaute was the defendant's business. She was responsible for purchasing the counterfeit injectables she used—she communicated directly with the suppliers—and of course it was the defendant who performed the injections. Nevertheless, she characterizes her crimes as a mere failure of oversight: "I recognize that I should have exercised greater caution, sought additional information, and maintained closer oversight of everything occurring within my business;" "I understand that regardless of my intentions, I am responsible for the decisions that were made and for the failure of supervision that occurred." *Id.* at 15, 16. This is not acceptance of responsibility, and the defendant's attempts to minimize and shift blame speak to her character.

The plea agreement between the parties explicitly allows the government to object to any reduction in the defendant's sentence based on acceptance of responsibility in the event that at sentencing, the defendant indicates that she does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crimes to which she pled guilty. *See* Dkt. No. 152 at 2. While the government is not formally retracting its agreement with respect to the sentencing guidelines calculation, or recommending an upward departure from the guideline range

as calculated by the parties in the plea agreement, it is the defendant's failure to accept responsibility that leads the government to recommend a sentence at the high end of that range. This middle-ground approach is not only appropriate but fair.

Beyond her failure to own up to her crimes is the defendant's lack of recognition, much less remorse, regarding the harm she caused. Most of her letter to the Court focuses on the impact this case has had on her life. *See, e.g.,* Dkt. No. 169 at 9–10 (asking the Court to "consider the extraordinary impact that [her] custodial status has had" on her personal life and ability to attend to her personal affairs); *id.* at 12 ("The consequences of this situation have been devastating to my professional life, personal and financial."). The defendant claims that she is "not attempting to portray [herself] as a victim[.]" *Id.* at 10. But again that is exactly what she is doing. She even complains about the media coverage of this case, lamenting that many reports "portrayed [her] in an extremely damaging manner, suggesting that [she] intentionally deceived customers and generated more than one million dollars through the sale of counterfeit products." *Id.* at 7–8. Those reports were accurate; that is what she did. The defendant is not the victim here, and her failure to acknowledge the true victims is concerning. Put simply, the defendant's history and characteristics are aggravating, not mitigating, and the only thing that explains her conduct is a mistaken belief that she is somehow above the law.

**C. A Significant Incarcerative Sentence Appropriately Reflects the Seriousness of the Defendant's Crimes, Promotes Respect for the Law, Provides Just Punishment, Affords Adequate Deterrence, and Protects the Public.**

The government's recommended sentence not only reflects the serious nature of the defendant's criminal conduct but also promotes respect for the law and provides both just punishment and adequate deterrence. In addition, a significant period of imprisonment protects the public from further crimes of the defendant, which Judge Hennessy recognized was necessary in

ordering that she be detained pretrial. *See* Dkt. No. 115 at 38:15–18 (finding that nothing short of detention would protect the public). The defendant's crimes, and her failure to accept responsibility for them, offend the rule of law. And with the rise of med spas, and the difficulty in regulating them, general deterrence here is especially important.[20] A meaningful term of incarceration is necessary to deter others who might be tempted to cut costs (and garner business by offering lower prices) through the use of counterfeit drugs and devices. Those who consider doing so should know that when they get caught, they will face serious consequences, and not only in the form of losing their business and/or paying financial penalties. Absent a significant prison sentence, others inclined to engage in this type of criminal conduct may decide that it is worth the risk. Further, for all the reasons discussed above, there is a real need for specific deterrence in this case. The defendant's history and characteristics, and her failure to accept responsibility, raise a serious concern that she poses a risk of recidivism. A significant period of incarceration is the surest way to deter the defendant from committing additional crimes, and to protect the public from her risk of re-offending.

## CONCLUSION

The defendant did not accidentally import counterfeit prescription drugs and devices. She did not believe that her aesthetician license allowed her to perform injection procedures. She purposely held herself out as a nurse to deceive her clients and used counterfeit products for her own benefit. Her conduct demonstrates a startling indifference to the health and safety of individuals who trusted her. And the fact that that indifference continues through the time of

[20] *See, e.g.*, https://www.youtube.com/watch?v=pzggl8C2fvs (Last Week Tonight with John Oliver episode discussing "the rapid growth of med spas in the U.S., who is performing medical procedures inside them, where their injectables are coming from, [and] how an overall lack of regulation is harming consumers").

sentencing demonstrates the need for a significant prison sentence. The government urges the Court to adopt its recommendation and impose a sentence of incarceration for 57 months, two years of supervised release, and restitution and forfeiture each in the amount of $1,001,562.45, in addition to the mandatory special assessment of $800.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: *<u>/s/ Leslie A. Wright</u>*
LESLIE A. WRIGHT
SARAH B. HOEFLE
Assistant United States Attorneys

**<u>Certificate of Service</u>**

I hereby certify that this document was filed through the ECF system on August 26, 2026 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By: *<u>/s/ Leslie A. Wright</u>*
LESLIE A. WRIGHT
Assistant United States Attorney